**BLOCK & LEVITON LLP**
Whitney E. Street
610 16th Street, Suites 214-216
Oakland, CA  94612
Tel: 415-968-8999
Fax: 617-507-6020
whitney@blockesq.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VLADIMIR GUSINSKY, as Trustee for the Vladimir Gusinsky Living Trust, derivatively on behalf of MCKESSON CORPORATION, | : No.  5:17-cv-4248 : : : : |
| Plaintiff, | : VERIFIED SHAREHOLDER DERIVATIVE : COMPLAINT FOR BREACH OF : FIDUCIARY DUTIES |
| v. | : |
| ANDY D. BRYANT, WAYNE A. BUDD, JOHN H. HAMMERGREN, M. CHRISTINE JACOBS, MARIE L. KNOWLES and EDWARD A. MUELLER, | : : DEMAND FOR JURY TRIAL : : |
| Defendants, | : |
| and | : |
| MCKESSON CORPORATION, | : |
| Nominal Defendant. | : |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    Plaintiff VLADIMIR GUSINSKY, as Trustee for the Vladimir Gusinsky Living Trust,

2   ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder

3   Derivative Complaint for Breach of Fiduciary Duties (the "Complaint") for the benefit of nominal

4   defendant McKesson Corporation ("McKesson" or the "Company") against certain current

5   members of its Board of Directors (the "Board") and executive officers, seeking to remedy

6   defendants' breaches of fiduciary duties.

7                              **INTRODUCTION**

8        1.   This case arises from the McKesson Board of Directors' sustained and systemic failure to

9   maintain oversight and effective controls in the distribution of controlled substances.  The Board's

10  actions and/or inactions caused the Company, for nearly a decade, to illegally distribute highly

11  addictive painkillers, including the opioids oxycodone and hydrocone.

12

13      2.   McKesson has admitted that it failed to abide by the terms of an Administrative

14  Memorandum of Agreement, entered into by McKesson and the U.S. Drug Enforcement

15  Administration ("DEA") on or about May 2, 2008 (the "2008 MOA").  In connection with the

16  2008 MOA, McKesson agreed to create a "Controlled Substances Monitoring Program"

17  ("CSMP").

18

19      3.   McKesson's admission came when it entered into another settlement, executed January 17,

20  2017 (the "2017 Settlement") in which the Company agreed to pay a $150 million civil penalty,

21  and to suspend sales of controlled substances from several distribution centers, for multiple years,

22  in order to resolve continued violations of applicable statutes and regulations governing controlled

23  substances.  The U.S. Department of Justice ("DOJ") described the $150 million payment as a

24  "record," and it said the suspensions "are among the most severe sanctions ever agreed to by a

25  [DEA] registered distributor."

26

27

28  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

4.  In settling with DEA and the DOJ in 2017, McKesson admitted that it breached the terms of its 2008 MOA by failing to "identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious…"

5.  McKesson also admitted that it should have identified these orders as "suspicious" based on guidance it received from the DEA in 2006 and 2007 (the "DEA Letters") concerning the requirements set forth in 21 U.S.C. § 842(a)(5) (a section of the Comprehensive Drug Abuse Prevention and Control Act of 1970; the ("CSA" or the "Act")), and corresponding regulations.

6.  Having approved the 2008 MOA, including the requirement to create a CSMP, the McKesson Board knew the Company had failed to comply with DEA rules and regulations regarding the distribution of various opioids. Rather than requiring the Company to comply with the terms of the 2008 MOA and the CSMP, the Board turned a blind-eye to the obligations it agreed to and continued to allow McKesson to ship opioids in violation of federal law. There should have been no need for McKesson to have to enter into the costly and burdensome 2017 Settlement.  Had the Board caused McKesson to simply abide by the terms of the DEA Letters and the 2008 MOA—of which the Board was acutely aware—McKesson could have avoided the costly 2017 Settlement.

7.  As a result of the actions and/or inactions of the Board, McKesson has not only suffered serious financial consequences, but has also contributed to a national epidemic of opioid abuse.

**JURISDICTION AND VENUE**

8.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332 in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

2

9.   Venue is proper in this District because McKesson conducts business and maintains its principal executive offices this District.  Upon information and belief, one or more of the individual Defendants resides in this District.  Further, McKesson engages in numerous activities and conducts business here, which had an effect in this District.

## PARTIES

10. Plaintiff is a current shareholder of McKesson, and has continuously held McKesson stock since 2005.  Plaintiff is a citizen of Illinois.

11. Nominal corporate defendant McKesson is a Delaware corporation with its principal executive offices located at One Post Street, San Francisco, California 94104.  McKesson is primarily engaged in the business of distributing pharmaceuticals.  McKesson partners with pharmaceutical manufacturers, providers, pharmacies, governments and other organizations in healthcare to provide medicines, medical products and healthcare services to patients.  McKesson operates through two segments: McKesson Distribution Solutions and McKesson Technology Solutions.  The Distribution Solutions segment distributes branded and generic pharmaceutical drugs and other healthcare-related products internationally and provides practice management, technology, clinical support and business solutions to community-based oncology and other specialty practices.  McKesson distributes pharmaceuticals to all 50 states in the United States.  The Technology Solutions segment provides clinical, financial and supply chain management solutions to healthcare organizations.  McKesson's stock is traded publicly on the New York Stock Exchange under the ticker symbol "MCK."

12. According to its most recent form 10-K, filed May 22, 2017, McKesson is the largest pharmaceutical distributor in the United States.  For the year ended March 31, 2017, it reported $198.5 billion in revenue, 99 percent of which was generated by its Distribution Solutions segment.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

13. Defendant Andy D. Bryant ("Bryant") has served as a director of the Company since January 2008.  Bryant is a citizen of Oregon.

14. Defendant Wayne A. Budd ("Budd") served as a director of the Company from October 2003, and was a member of the Board's Audit Committee (the "Audit Committee"), until his retirement on July 26, 2017.  Budd is a citizen of Massachusetts.

15. Defendant John H. Hammergren ("Hammergren") has served as the Company's President and Chief Executive Officer ("CEO") since 2001 and as Chairman of the Board since 2002. Hammergren is a citizen of California.

16. Defendant M. Christine Jacobs ("Jacobs") has served as a director of the Company since January 1999.  Jacobs is a citizen of Georgia.

17. Defendant Marie L. Knowles ("Knowles") has served as a director of the Company since March 2002, and is the Chair of the Audit Committee.  Knowles is a citizen of California.

18. Defendant Edward A. Mueller ("Mueller") has served as a director of the Company since April 2008 and as Lead Independent Director since July 2013.  Mueller is a citizen of Colorado.

19. Defendants Bryant, Budd, Hammergren, Jacobs, Knowles and Mueller are collectively referred to as "Defendants."  Defendants Budd and Knowles are collectively referred to as the "Audit Committee Defendants."

20. The following chart shows the Defendants' membership on Board committees during their respective tenures (as identified in the annual proxy filed for the fiscal years below):

| Defendant | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|-----------|------|------|------|------|------|------|------|------|
| Bryant | A, F | A, F | A, F | A, F | A, F | A, F | C, F | C, F |
| Budd | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG | A, CG |
| Hammergren | | | | | | | | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

| Defendant | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|-----------|------|------|------|------|------|------|------|------|
| Jacobs | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG |
| Knowles | A, F | A, F | A, F | A, F | A, F | A, F | A, F | A, F |
| Mueller | C, F | C, F | C, CG | C, CG | C, CG | C, CG | C, CG | C, CG |

A: Audit; C: Compensation; CG: Corporate Governance;[1] F: Finance

## SUBSTANTIVE ALLEGATIONS

21. McKesson distributes pharmaceuticals through a network of distribution centers located throughout the United States ("Distribution Centers").

22. McKesson's pharmaceutical distribution business is heavily regulated.  In particular, McKesson Distribution Centers are required to operate in accordance with the statutory requirements of the CSA, 21 U.S.C. §§ 801 *et seq.*, and the regulations promulgated pursuant to the CSA, 21 C.F.R. Part 1300 *et seq.*

23. The regulations require McKesson to design and operate a system to detect and report "suspicious orders" for controlled substances, as that term is defined in the regulation.  *See* 21 C.F.R. § 1301.74(b).

24. The DEA sent McKesson the "DEA Letters," which were guidance for identifying and reporting suspicious orders to the DEA, as required by 21 C.F.R. § 1301.74(b).  The DEA Letters were sent to McKesson on or about September 27, 2006, February 7, 2007 and December 27, 2007 (the "DEA Letters").

---

[1] Renamed "Governance" in 2014.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

5

**In 2008, McKesson Is Forced To Settle Claims By The DOJ Relating To Failures To Report Suspicious Distributions Of Controlled Substances**

25. Prior to May 2008, McKesson failed to abide by its statutory obligations, its regulatory obligations, or the guidance in the DEA Letters.  According to a public statement by the DOJ dated May 2, 2008, McKesson

> failed to report to DEA suspicious sales of controlled substance pharmaceuticals it made to pharmacies that filled orders from illegal "Internet pharmacies" that sell drugs online to customers who do not have a legal prescription.  McKesson also failed to report suspicious orders of controlled substance pharmaceuticals that it received from other pharmacies and clinics even though the orders were suspiciously large.

26. According to the DOJ, McKesson made these shipments "even after a Sept. 1, 2005 meeting at which DEA officials met with and warned McKesson officials about excessive sales of their products to pharmacies filling illegal online prescriptions." As a result of McKesson's shoddy oversight, the DOJ said that "millions of dosage units of controlled substances were diverted from legitimate channels of distribution."

27. To resolve this misconduct, McKesson entered into the 2008 MOA, as well as a settlement agreement with the DOJ (collectively, the "2008 Agreements").  McKesson agreed to pay $13.25 million in civil penalties under the 2008 Agreements.  Pursuant to the 2008 Agreements, McKesson also agreed to develop a "Controlled Substance Monitoring Program," ("CSMP") in which it recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA.

28. The 2008 Agreements achieved Board-level attention, and each of the Defendants served on McKesson's Board as of May 2008.  In short, the Defendants knew of the 2008 Agreements, and McKesson's obligations under them.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

29. McKesson described the 2008 Agreements in a Form 10-K, filed just five days later on May 7, 2008, and signed by each of the Defendants.  McKesson reported that "On May 2, 2008, we entered into two agreements which resolved previously disclosed claims by the Drug Enforcement Administration ("DEA") and six USAOs that between 2005 and 2007, certain of our pharmaceutical distribution centers fulfilled customer orders for select controlled substances, which orders were not adequately reported to the DEA."

30. McKesson had previously reported, on Form 10-Q for the period ending December 31, 2007, filed with the SEC on February 1, 2008, that it was seeking to resolve claims with the DEA and certain U.S. Attorneys General that between 2005 and 2007 certain of McKesson's distribution centers fulfilled orders of controlled substances that were not adequately reported to the DEA.

31. At that time, McKesson reported that "We have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims of this type…we believe that the procedures and processes we are implementing will satisfy concerns of the relevant agencies …"

**A 2017 Settlement Reveals That McKesson Engaged In The Same Misconduct Again**

32. McKesson's so-called "improvements," and its CSMP, failed completely.  The 2017 Settlement revealed that, from January, 2009 through January 17, 2017, McKesson

     a. "had failed to maintain effective controls against diversion of controlled substances … in violation of the CSA and the CSA's implementing regulatoins" at 12 different Distribution Centers;

     b. "failed to properly monitor its sales of controlled substances and/or report suspicious orders to the DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA and 21 C.F.R. § 1301.74(b);

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

c.  "failed to follow the procedures and policies set forth in the McKesson CSMP to detect and disclose suspicious orders of controlled substances. Among other things, McKesson failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious order reporting procedures set forth in the McKesson CSMP";

d.  "failed to inform the DEA Field Division Offices and/or DEA Headquarters of suspicious orders of controlled substances made by its customers during the Covered Time Period, including orders of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency, as required by and in violation of 21 C.F.R. §130l .74(b), 21 U.S.C. § 842(a)(5), and the 2008 Agreements";

e.  "failed to report suspicious orders for controlled substances in accordance with the standards identified and outlined by the DEA [the DEA Letters]"; and

f.  "Certain McKesson Distribution Centers distributed controlled substances to pharmacies even though those Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § I306.04(a)."

33. In short, despite entering into the 2008 Agreements, and creating the CSMP "McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

8

frequently misused products that are part of the current opioid epidemic," according to the DOJ's announcement of the 2017 Settlement.

34. One example provided by the DOJ: "McKesson did not fully implement or adhere to its own program.  In Colorado, for example, McKesson processed more than 1.6 million orders for controlled substances from June 2008 through May 2013, but reported just 16 orders as suspicious."

35. The DOJ, in its announcement of the 2017 Settlement, described the $150 million penalty as a "record."  As part of the settlement, McKesson also agreed to suspend controlled substance shipments from its Aurora, Colorado, Distribution Center for three years, its Livonia, Michigan, Distribution Center for two years, and from its Washington Court House, Ohio, Distribution Center for two years.  McKesson also agreed that its Lakeland, Florida, Distribution Center would suspend delivery of Schedule II hydromorphone products for two years.  These were among "the most severe sanctions ever agreed to by a [DEA] registered distributor," according to the DOJ.

36. McKesson also agreed to make various reports of its controlled substance shipments to the DEA. McKesson also agreed to specific, rigorous staffing and organizational improvements; periodic auditing; and stipulated financial penalties for failing to adhere to the compliance terms. Critically, the 2017 Settlement required McKesson to engage an independent monitor to assess compliance – the first independent monitor of its kind in a CSA civil penalty settlement.

**West Virginia Has Sued McKesson For The Same Oversight Failures**

37. The Defendants' laxity has exposed McKesson to additional potential liabilities, beyond the $150 million civil penalty paid to the federal government.  On January 21, 2016, the State of West Virginia brought suit against McKesson, *State of West Virginia v. McKesson Corporation*, No. 16-C-1 (Boone County, W.V.), alleging, *inter alia*, that "[f]rom 2007-2012, [McKesson]

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

9

distributed enough doses to provide 52.3 doses of Oxycodone or Hydrocodone [both highly addictive painkillers] to every man[,] woman[,] and child in Boone County, WV."

38. West Virginia asserted that McKesson:

    a.   "shipped millions of doses of highly addictive controlled pain killers into the state, many of which should have been stopped and/or investigated as suspicious orders";

    b.   "failed to adopt any affirmative efforts to prevent diversion of its medicines to illegal purposes," it "willfully ignored substantial orders for highly addictive prescription pain killers to the State of West Virginia and to counties where the rate of abuse was well documented";

    c.   "knew or should have known it was causing the epidemic of prescription drug abuse in West Virginia"; and

    d.   "failed to diligently identify and report suspicious orders it received," and "either blindly ignored suspicious orders or failed to develop a system sufficient to adequately identify suspicious orders as they were received."

39. McKesson faces substantial liability in the *West Virginia* matter.

**Defendants' Misconduct is Revealed.**

40. McKesson announced on April 30, 2015 that it had reached an "agreement in principle," on the deal that would culminate in the 2017 Settlement.

41. In a Form 8-K filed that day, McKesson said that it had "reached an agreement in principle" with the DEA, DOJ, and various U.S. Attorney's offices to settle claims "relating to investigations about the Company's suspicious order reporting practices for controlled substances." In the April 30, 2015 announcement, McKesson disclosed the $150 million payment, it said that it would "implement certain remedial measures," and also suspend distribution of certain products from certain Distribution Centers for fixed periods of time.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

42. McKesson's April 2015 8-K, however, did not provide any indication that McKesson had admitted that suspicious orders "should have been detected by McKesson as suspicious in a manner fully consistent with the requirements set forth in the 2008 MOA," and the DEA Letters. McKesson did not disclose, at that time, that it could have avoided the 2017 Settlement by simply abiding by the 2008 Agreements.

43. On January 17, 2017 McKesson shareholders learned (among other things) that McKesson had "failed to properly monitor its sales of controlled substances and/or report suspicious orders to the DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA, and 21 C.F.R § 1301.74(b)."

**Plaintiff Utilized the "Tools at Hand" And Learned That Defendants Failed To Demand Any Meaningful Information About The CSMP Or McKesson's Distribution Of Controlled Substances In Order To Discharge Their Oversight Responsibilities**

44. Upon learning of McKesson's egregious failure to abide by the 2008 Agreements, Plaintiff made a demand upon McKesson, pursuant to Section 220 of the General Corporation Law of the State of Delaware, for various categories of books and records.  Under Section 220(b), "Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from" various categories of corporate records. (Plaintiff's Section 220 Demand Letter is attached hereto as Exhibit A.).

45. Plaintiff made his Section 220 Demand in light of the repeated suggestion of the Delaware Supreme Court that shareholders should utilize such demands as the "'tools at hand' to obtain the necessary information before filing a derivative action" against a Delaware corporation.  *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006).

46. In particular, Plaintiff requested—and McKesson agreed to produce—board minutes and documents provided to the Board concerning its oversight of the implementation of CSMP from

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

11

January 1, 2008 through the present. As part of the parties' negotiations, the parties agreed that "all documents produced in response to the Demand [would] be deemed incorporated by reference in any pleading [Plaintiff] file[d] in any Litigation and that those documents [could] be relied upon in connection with any motion to dismiss." In other words, McKesson and its Board had every incentive in the world to provide exculpatory documents—knowing that they would be able to rely on those documents in support of a motion to dismiss.

47. According to the Company's annual proxies, the Board held an average of 8.2 board meetings per year between 2008 and 2017.[2] And the Board members were handsomely compensated for their services. This chart shows the total compensation paid to each of the Defendants by McKesson since 2008 based on information provided in its annual proxies:

|  | Hammergren | Bryant | Budd | Jacobs | Knowles | Mueller |
|---|---|---|---|---|---|---|
| **FY 2017** | $20,096,599 | $308,682 | $312,182 | $285,682 | $316,182 | $335,691 |
| **FY 2016** | $23,649,638 | $313,558 | $319,400 | $284,619 | $332,250 | $350,069 |
| **FY 2015** | $24,844,555 | $269,555 | $272,131 | $252,131 | $277,131 | $303,685 |
| **FY 2014** | $25,919,882 | $288,827 | $303,253 | $266,106 | $294,554 | $315,417 |
| **FY 2013** | $51,744,999 | $292,989 | $301,033 | $260,148 | $307,849 | $262,367 |
| **FY 2012** | $39,680,322 | $269,209 | $299,871 | $253,906 | $306,411 | $258,434 |
| **FY 2011** | $46,149,360 | $281,444 | $295,494 | $278,029 | $302,230 | $270,578 |
| **FY 2010** | $54,584,021 | $267,536 | $274,763 | $272,060 | $291,460 | $261,421 |
| **FY 2009** | $37,157,668 | $250,332 | $283,653 | $264,226 | $298,614 | $281,814 |
| **FY 2008** | $39,942,625 | $90,723 | $271,151 | $257,147 | $284,908 | $0 |
| **TOTAL** | $363,769,669 | $2,632,855 | $2,932,931 | $2,674,054 | $3,011,589 | $2,639,476 |

[2] The Board met 8 times during fiscal year (FY) 2017; 9 times during FY 2016; 7 times during FY 2015; 10 times during FY 2014; 10 times during FY 2013; 8 times during FY 2012; 8 times during FY 2011; 7 times during FY 2010; 8 times during FY 2009; and 7 times during FY 2008.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

1 ████████████████████████████████████████████

2 █████████████████████████████████████████████

3 █████████████████████████████████████████████

4 █████████████████████████████████████████████

5 ████████████████████████████████████████████

6

7 ██████████████████████████████████████████████

8 ████████████████████ Government action, spread over the course of several years, would

9 eventually reveal McKesson's total lack of regulatory oversight.  For example, the 2017 Settlement

10 reflects that that the DEA executed an Administrative Inspection Warrant ("AIW") on March 12,

11 2013 at a Distribution Center in Aurora, Colorado.  A series of AIWs and inspections followed.

12 58. McKesson then disclosed in its January 30, 2014 10-Q that the U.S. Attorney for the

13 Northern District of West Virginia was investigating "potential claims under the Comprehensive

14 Drug Abuse Prevention and Control Act. "

15 59. The government investigation was ramping up, as Defendants' laxity began to catch up to

16 McKesson.  For example, on or about August 13, 2014, McKesson received a letter from the U.S.

17 Attorney for the District of Colorado alleging that McKesson failed to "maintain[] ... effective

18 controls against diversion of particular controlled substances," 21 U.S.C. § 823(b)(l), and failed to

19 "design and operate a system to disclose to the registrant suspicious orders of controlled

20 substances," 21 C.F.R. § 130 1 .74(b).

21 60. Then, on or about November 14, 2014, McKesson received a letter (dated November 4,

22 2014) from the DEA's Office of Chief Counsel, Diversion Regulatory and Litigation Section,

23 stating that DEA was separately pursuing administrative action against McKesson for the conduct

24 outlined in the August 13, 2014 Letter. DEA also stated that the allegations regarding McKesson's

25

26

27

28 VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

failure to "maintain[] . .. effective controls against diversion of particular controlled substances," 21 U.S.C. § 823(b)(l), and failure to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," 21 C.F.R. § I 301.74(b) was national in scope.

61. If the Defendants thought that their oversight efforts with respect to controlled substances were "satisfactory" they were sorely mistaken. And they should have known that they were mistaken. Given the 2008 MOA and the CSMP that it imposed, the Board had a heightened obligation to pay special attention to these issues. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**The National Opioid Crisis Made Heightened Enforcement An Obvious Risk**

62.    In evaluating Defendants' monitoring efforts, it is important to consider the larger national backdrop. The following chart, taken from the Centers for Disease Control and Prevention

web site, shows that the rate of opioid overdose deaths in the United States more than tripled between 2000 and 2015:



63. Unsurprisingly, federal, state and local governments have all responded to the crisis. A January 2017 article by the New York Times noted that "Public health officials have called the current opioid epidemic the worst drug crisis in American history, killing more than 33,000 people in 2015. Overdose deaths were nearly equal to the number of deaths from car crashes. In 2015, for the first time, deaths from heroin alone surpassed gun homicides." In response, cities and states filed lawsuits against major opioid manufacturers for misleading marketing policies[4] and enacted severe regulatory crackdowns.

_____

[4] The first such suit was filed by the State of Kentucky against Purdue Pharma L.P. in 2007. Many others followed, including the City of Chicago, which sued Purdue, Johnson & Johnson, Teva Pharmaceutical Industries, Endo Health and Actavis in 2013 and Orange County and Santa Clara County, which filed suit against those same five manufacturers in May 2014. A July 4, 2017 story in the Washington Post stated that "[w]ithin the past year, at least 25 states, cities and counties have filed civil cases against manufacturers, distributors and large drugstore chains that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

64. This should not have come as a surprise to Defendants. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

**Defendants' Duties**

65. The Defendants' above-described conduct fails to comply with their duties as members of McKesson's Board of Directors.

66. By reason of their positions as officers, directors, and fiduciaries of McKesson and because of their ability to control the business and corporate affairs of McKesson and its subsidiaries, Defendants owed McKesson and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage McKesson in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of McKesson and its shareholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to McKesson and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

67. McKesson's corporate documents (such as the Company's Corporate Governance Guidelines and the Charter of the Governance Committee of the Board) also expressly detail the

---

make up the $13 billion-a-year opioid industry," including the attorneys general of Ohio, Missouri, and Oklahoma.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

Board's duties, including that the Board ensure that the Company operates in a legal and ethically responsible matter.

68. McKesson maintains, and the directors are obligated to follow, formal Corporate Governance Guidelines, which are specifically adopted by the Board "to assist the Board in the exercise of its responsibilities." The Corporate Governance Guidelines are meant to ensure that the Company operates in a legal and ethically responsible manner. As stated in the Corporate Governance Guidelines:

> The business and affairs of the Company shall be conducted under the direction and oversight of the Board. The members of the Board are elected by the stockholders to oversee management for the benefit of the long-term interests of the stockholders of the Company. Directors are expected to spend the time and effort necessary to properly discharge their responsibilities.

69. Under the Corporate Governance Guidelines, the Board is also charged with:

> monitor[ing] both the performance of the Company (in relation to its financial objectives, major goals, strategies and competitors) and the performance of the Company's Chief Executive Officer ("CEO"), and offer him or her constructive advice and feedback. The Board is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner.

70. Under the Company's By-Laws and Corporate Governance Guidelines, the Board has responsibility for overseeing the business and affairs of the Company, including risk management, which includes periodic reviews of the Company's enterprise risk management processes for identifying, ranking and assessing risks across the organization.

71. The Board has several committees to monitor specific aspects of McKesson's business. These committees have their own charters setting forth additional duties for their respective members. For example, the charter of the Audit Committee provides that its members have a special obligation to monitor the Company's compliance with the law. The charter states that the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

19

Audit Committee must monitor, among other things, "compliance by the Company with legal and regulatory requirements."  The Audit Committee's duties also include that it:

> Discuss annually with the individual(s) with operational responsibility for the compliance and ethics program the implementation and effectiveness of the Company's compliance and ethics program in detecting and preventing violations of law and the Company's Code of Business Conduct and Ethics.

72. Defendants, because of their positions of control and authority as directors and/or officers of McKesson, were able to and did, directly and/or indirectly, exercise control over the wrongful acts and/or omissions complained of herein. Because of their advisory, executive, managerial, and directorial positions with McKesson, each of the Defendants had knowledge of the acts and/or omissions described herein.

73. To discharge their duties, the officers and directors of McKesson were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of McKesson were required to, among other things:

a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

74. In light of the revelations of the 2017 Settlement, it is apparent that the Defendants failed to comply with their duties as Board members.

## **DEMAND ON THE BOARD WOULD BE FUTILE**

75. Plaintiff brings this action derivatively in the right and for the benefit of McKesson to redress the breaches of fiduciary duty and other violations of law by Defendants.

76. Plaintiff will adequately and fairly represent the interests of McKesson and its shareholders in enforcing and prosecuting this type of action.

77. Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

78. The Board currently consists of the following nine (9) directors: Defendants and non-defendants N. Anthony Coles, Donald R. Knauss and Susan R. Salka.  Defendants, a majority of the current Board (six out of nine members), were members of the McKesson Board at the time of the 2008 Agreements and prior DEA penalty.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act because Defendants would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in McKesson's improper misconduct.

79. Defendants (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Defendants knew of the wrongdoing but failed to act in the face of a known duty to act.  For example, all of the Defendants were aware of the 2008 Agreement, yet they ignored their obligations to cause McKesson to abide by those obligations.

80. For these reasons, each Defendant faces a substantial likelihood of liability for their participation in the illicit acts.  The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law and the CSMP can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties.  Despite being aware of the Company's prior misconduct concerning improperly reporting suspicious orders of controlled substances to the DEA, the Defendants took no steps in an effort to prevent or remedy the situation, and that failure to take any action resulted in substantial corporate losses.  For these reasons, the Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

81. All of the Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight.  Moreover, the 220 Production shows that they devoted patently inadequate time to compliance with the controlled substance laws in general, and the 2008 Agreements in particular.

82. Defendants' conduct resulted in the Company suffering the $150 million fine and losing hefty future profits that will not be realized because the Company was suspended from selling from its distribution centers in Colorado, Ohio, Michigan and Florida for multiple years.  This was in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as McKesson's own Code of Conduct, Corporate Governance Guidelines and the CMSA.  Thus, Defendants (a majority of the Board) each face a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

83. Hammergren is the President and CEO of McKesson, and in that capacity, he receives substantial monetary compensation and other benefits.  McKesson admits in its annual proxy statement filed with the SEC on June 17, 2016 and other public filings that Hammergren is not

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

22

independent.   Hammergren thus lacks independence, rendering him incapable of impartially considering a stockholder demand to commence and vigorously prosecute this action.

84. Budd and Knowles are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. Budd and Knowles have both served as directors on the Board since at least 2008 and have also served as members of the Audit Committee since 2008.  As set forth above, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations and internal policies.  The Audit Committee Defendants violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

85. A majority of the Board face a substantial likelihood of personal liability because they deliberately disregarded red flags of improper distribution and reporting practices eventually resulting in the 2017 Settlement.  Each of the Directors deliberately or recklessly disregarded the Company's misconduct since at least 2008, when McKesson entered into the 2008 Agreements and purported to implement the CSMP to prevent the violations of the CSA described herein.

86. As alleged herein and based on the duties imposed pursuant to the Company's Corporate Governance Guidelines, Delaware law, and the obligations set forth in McKesson's CSMP, the Defendants were aware of indicators and warnings that necessarily informed them of the CSA violations taking place within the Company.

87. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████     ███████████

███████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

88. Given the duties placed on the Board, to the extent any of the Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within McKesson, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith of their duties.

89. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

90. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91. Defendants all owed and owe fiduciary duties to McKesson.  By reason of their fiduciary relationships, Defendants specifically owed and owe McKesson the highest obligation of good faith and loyalty in the administration of the affairs of McKesson, including assuring that McKesson complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to McKesson alleged herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

92. Defendants also had a duty to develop and implement a CSMP, which McKesson agreed to put in place in connection with the 2008 Agreements to ensure that the Company complied with federal law in reporting suspicious orders of controlled substances.

93. Defendants willfully ignored their obligations under federal law, McKesson's internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to report suspicious orders.  Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

94. Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent McKesson from failing to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels after receiving numerous warnings and indicators, including a prior DEA investigation and fine in connection with the Company's failure to comply with the CSA.

95. Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that McKesson complied with its affirmative duty to implement and comply with the CSMP, as required by the 2008 Agreements.

96. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of McKesson in a manner consistent with the duties imposed upon them by law.

97. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and loyalty in the management and administration of McKesson's affairs and in the use and preservation of McKesson's assets.

98. As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, McKesson has sustained significant damages, not only monetarily, but also

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

to its corporate image and goodwill.  Such damage includes, among other things, the substantial penalties, fines, sales suspension and expenses described herein.

99. As a result of the misconduct alleged herein, Defendants are liable to the Company.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law and demand on the McKesson Board is excused;

B.      Awarding against all Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.      Awarding to McKesson restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Directing McKesson to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 26, 2017                        **BLOCK & LEVITON LLP**

                                            By: /s/ Whitney E. Street
                                            Whitney E. Street (State Bar No. 223870)
                                            610 16th Street, Suites 214-216
                                            Oakland, CA  94612
                                            Tel: 415-968-8999
                                            Fax: 617-507-6020

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

1

whitney@blockesq.com

2

Jeffrey C. Block (*pro hac vice* forthcoming)
Thomas Kirchofer (*pro hac vice* forthcoming)

3

Joel Fleming (CA Bar No. 281264)
BLOCK & LEVITON LLP

4

155 Federal Street, Suite 400
Boston, MA 02110

5

Tel: 617-398-5600

6

Fax: 617-507-6020
jeff@blockesq.com

7

tom@blockesq.com
joel@blockesq.com

8

9

*Counsel for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

# EXHIBIT A

Direct dial 617-398-5610 | email: jeff@blocksq.com

May 17, 2017

**VIA COURIER**

Board of Directors
Attn: Corporate Counsel
McKesson Corporation
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

      Re:    <u>**Demand for Inspection of Books and Records**</u>

Dear Sir or Madam:

I write this letter on behalf of the Vladimir Gusinsky Living Trust ("Stockholder").

Stockholder is the beneficial owner of 20 shares of common stock of McKesson Corporation ("McKesson" or the "Company"). As evidence of Stockholder's beneficial ownership, enclosed with this letter is a true and correct copy of the Affidavit of Vladimir Gusinsky, the sole trustee of Stockholder, attaching proof of Stockholder's ownership.

As used hereafter, the "Board" means the board of directors of McKesson, any committee thereof, or any persons or entities representing or purporting to represent, or acting or purporting to act on behalf of, any of the foregoing.

## I.    BOOKS AND RECORDS DEMANDED

Pursuant to Section 220 of the General Corporation Law of the State of Delaware, Stockholder hereby demands the right to inspect and copy the following books and records of the Company (unless otherwise specified, the time-period relating to this request is January 1, 2008 to the present):

1. All minutes of any meeting (including all draft minutes, agendas, and exhibits to such minutes or agendas) of the Board during which any of the following topics were discussed or raised:

   a. The 2008 settlement agreement with the United States Department of Justice ("DOJ") and Memorandum of Agreement with the United States Drug Enforcement Agency ("DEA") (collectively the "2008 Settlement Agreement");

   b. The Controlled Substance Monitoring Program ("CSMP") developed in connection with the 2008 Settlement Agreement;



155 Federal Street, Suite 400 • Boston, Massachusetts 02110
P 617 398 5600 • F 617 507 6020



    c.  The agreement reached with the DOJ announced on January 17, 2017 pursuant to which McKesson paid a $150 million settlement arising from the Company's failure to report suspicious orders of addictive painkillers in violation of the Controlled Substance Act ("CSA") (the "2017 Settlement").

2.  All documents reviewed or considered by the Board in connection with any meeting during which any of the items enumerated above in Request 1(a) through (c) were discussed.

3.  All communications between or among the directors or officers of McKesson regarding any of the items enumerated above in Request 1(a) through (c).

4.  Documents concerning the implementation and monitoring of the CSMP.

Stockholder hereby demands that (1) originals or attested copies of the foregoing documents and records be made available for inspection and copying by Stockholder, its designated representatives, or its attorneys or agents during usual business hours until the inspection is completed, or (2) the Company deliver copies of such records, within five business days after receipt of this letter, to the attention of Stockholder's counsel, Jeffrey C. Block, at the law firm of Block & Leviton LLP; 155 Federal St., Suite 400, Boston, MA 02110; Telephone: (617) 398-5600.

Please advise me as soon as possible and, in any event, on or prior to the expiration of five business days after the date this demand is received by the Company, when and where the items demanded above will be made available to Stockholder and its designated agents, or, in lieu thereof, when copies of such items will be delivered to the undersigned.

## II.   PURPOSE FOR DEMAND

The purposes of this demand for an inspection are:

1.  To gather information in support of a potential stockholder resolution or proposal to the Board in connection with the matters discussed in the "Basis for Demand";

2.  To investigate mismanagement by the directors and/or officers of McKesson in connection with the matters discussed in the "Basis for Demand" section below;

3.  To investigate the possibility of breaches of fiduciary duty by the directors and/or officers of McKesson in connection with the matters discussed in the "Basis for Demand" section below; and

4.  To investigate the independence and disinterest of the Board, and to determine whether a pre-suit demand is necessary or would be excused prior to commencing any derivative action on behalf of the Company.



### III.   BASIS FOR DEMAND

The grounds supporting this demand are as follows:

On or about September 27, 2006, February 7, 2007 and December 27, 2007, the DEA's Deputy Assistant Administrator, Office of Diversion Control, sent McKesson letters providing guidance for the identification and reporting of suspicious orders to DEA, as required by 21 C.F.R. §1301.74(b) (the "DEA Letters").

On May 2, 2008, in connection with the 2008 Agreements, Defendants caused McKesson to pay $13.25 million to settle claims that the Company failed to report suspicious sales of medications. The 2008 Agreements settled claims between the Company, the DEA and six U.S. Attorney's Offices for alleged violations of the Company's obligations under the CSA between 2005 and 2007.  The 2008 Agreements settled claims that McKesson failed to report to the DEA suspicious sales of certain controlled substances to pharmacies that filled orders from illegal "Internet pharmacies" that sell drugs online to customers who do not have a legal prescription.  McKesson also failed to report suspicious orders of controlled substances that it received from other pharmacies and clinics even though the orders were unusually large. As disclosed by McKesson in its 2007 Form 10-K:

> On May 2, 2008, we entered into two agreements which resolved previously disclosed claims by the Drug Enforcement Administration ("DEA") and six USAOs that between 2005 and 2007, certain of our pharmaceutical distribution centers fulfilled customer orders for select controlled substances, which orders were not adequately reported to the DEA. The settlements were achieved consistent with the previously disclosed $13 million reserve established for these matters. These settlements resolve all administrative and civil claims arising out of the investigations.

As part of the 2008 Agreements, Defendants were required to develop the CSMP under which the Company recognized it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA. Each of the current Board Members were members of the McKesson Board at the time of the 2008 Agreements.

On March 12, 2013, the DEA executed an Administrative Inspection Warrant at McKesson's Aurora, Colorado distribution facility.  And between March 2013 and 2017 the DEA executed one additional warrant and served numerous subpoenas investing and inspecting several of McKesson's distribution facilities (approximately one-third of its facilities), including the following locations: (i) Washington Court House, Ohio; (ii) Livonia, Michigan; (iii) Lakeland, Florida; (iv) Methuen, Massachusetts; (v) Aurora, Illinois; (vi) Delran, New Jersey; (vii) LaCrosse, Wisconsin; (viii) La Vista, Nebraska; (ix) Ruther Glen, Virginia; (x) West Sacramento, California.

On or about August 13, 2014, McKesson received a letter from the U.S. Attorney for the District of Colorado setting forth allegations that McKesson failed to maintain effective



controls against diversion of particular controlled substances and failed to design and operate a system to report suspicious orders of controlled substances in violation of the CSA. On or about November 14, 2014, McKesson received a letter from the DEA stating that the DEA was separately pursuing administrative action detailed by the Colorado U.S. Attorney and for failures at ten additional McKesson distribution facilities.

On April 30, 2015, Defendants caused McKesson to file with the SEC a Form 8-K announcing that it reached an agreement in principle with the DEA, DOJ, and various U.S. Attorneys' offices to settle all potential administrative and civil claims relating to investigations about the Company's suspicious order reporting practices for controlled substances.

On January 21, 2016, the State of West Virginia brought suit against McKesson, *State of West Virginia v. McKesson Corporation*, No. 16-C-1 (Boone County, W.V.), alleging, *inter alia*, that "[f]rom 2007-2012, [McKesson] distributed enough doses to provide 52.3 doses of Oxycodone or Hydrocodone [both highly addictive painkillers] to every man[,] woman[,] and child in Boone County, WV."

West Virginia asserted that:

- McKesson "shipped millions of doses of highly addictive controlled pain killers into the state, many of which should have been stopped and/or investigated as suspicious orders";

- McKesson "failed to adopt any affirmative efforts to prevent diversion of its medicines to illegal purposes," it "willfully ignored substantial orders for highly addictive prescription pain killers to the State of West Virginia and to counties where the rate of abuse was well documented";

- McKesson "knew or should have known it was causing the epidemic of prescription drug abuse in West Virginia"; and

- McKesson "failed to diligently identify and report suspicious orders it received," and "either blindly ignored suspicious orders or failed to develop a system sufficient to adequately identify suspicious orders as they were received."

Then, on January 17, 2017, Defendants caused the Company to issue a press release announcing the $150 million settlement with the DEA and DOJ. The Company disclosed that its improper reporting practices dated back to 2009, and were challenged by the DEA in 2013. McKesson further stated in the press release that it has implemented significant changes to its monitoring and reporting processes since 2013. That same day, the DOJ also issued a press release concerning the 2017 DEA Settlement that called McKesson's $150 million civil penalty a "record" for violations of the CSA. Acknowledging McKesson's 2008 $13.25 million civil penalty and administrative agreement for "similar violations," the DEA "alleged again that McKesson failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small chain pharmacy customers – *i.e.*, orders that are unusual in their frequency, size, or other patterns."



Despite the 2008 Agreements and the requirement to implement the CSMP, McKesson failed to comply with the CSA and the CSMP and continued to fail to report to the DEA "suspicious orders" for controlled substances, namely opioids.

In disclosing the 2008 Agreements, the Company stated in its Form 10-Q for the period ending December 31, 2007:

> We have been implementing improvements to our comprehensive controls and reporting procedures to avoid future claims of this type. Based on our understanding of these claims and the settlement discussions with the DEA and USAOs, we believe that the procedures and processes we are implementing will satisfy concerns of the relevant agencies, and that we have established an adequate reserve for such claims.

As part of the 2017 Settlement, however, the Company admitted that:

- McKesson failed to follow the procedures and policies set forth in the McKesson CSMP to detect and disclose suspicious orders of controlled substances. Among other things, McKesson failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious order reporting procedures set forth in the McKesson CSMP.

- In addition, McKesson failed to inform the DEA Field Division Offices and/or DEA Headquarters of certain suspicious orders of controlled substances made by its customers during [January 1, 2009 through January 17, 2017], including order of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency, as required by and in violation of 21 C.F.R. § 130.74(b), 21 U.S.C. § 842(a)(5), and the 2008 Agreements.

- McKesson failed to report suspicious orders for certain controlled substances in accordance with the standards identified and outlined by the DEA in three letters from the DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including McKesson, on September 27, 2006, February 7, 2007, and December 27, 2007.

- Certain McKesson Distribution Centers distributed controlled substances to pharmacies even though those Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a).



Settlement Agreement at 3-4 (available at https://www.justice.gov/opa/press-release/file/928471/download, last visited Mar. 22, 2017).

Based on these facts, there are sufficient grounds to believe that wrongdoing, including multiple breaches of fiduciary duties, occurred that warrant an investigation under Section 220 of the Delaware General Corporation law.

I hereby declare and affirm under the penalty of perjury, pursuant to the laws of the Commonwealth of Massachusetts and the State of Delaware, that the foregoing is true and correct.

Sincerely,

Jeffrey C. Block